**Alberto M. GUINTO, Jr. and Stella Suarez, Plaintiffs,**

**v.**

**Ferdinand Edralin MARCOS and Does I through C, Inclusive, Defendants.**

**Civ. No. 86–0737–R(CM).**

United States District Court, S.D. California.

Oct. 31, 1986.

Fred H. Arm, San Diego, Cal., for plaintiffs.

Charles G. Miller, Bartko, Welsh, Tarrant & Miller, San Francisco, Cal., for defendants.

MEMORANDUM DECISION AND ORDER

RHOADES, District Judge.

Defendant Marcos' motion to dismiss plaintiffs' first amended complaint came on regularly for hearing on August 25, 1986, before the Honorable John S. Rhoades. Fred H. Arm appeared on behalf of plaintiffs Alberto M. Guinto, Jr. and Stella Suarez. Charles G. Miller and Bartko, Welsh, Tarrant & Miller appeared on behalf of defendant Ferdinand Marcos.

After hearing argument and considering the record and authorities cited, the court granted the defendant's motion and ordered that plaintiffs' first amended complaint be dismissed with prejudice. An order to that effect was entered on September 22, 1986. This memorandum decision sets forth the reasons for granting the defendant's motion.

BACKGROUND

Plaintiffs, both Philippine citizens, reside in the State of California. Defendant, also a Philippine citizen, at present resides in the State of Hawaii. In their first amended complaint (the "Complaint"), plaintiffs allege that defendant and unnamed aides and associates violated plaintiffs' rights arising under the First Amendment of the United States Constitution by seizing and restraining distribution of a film that plaintiffs produced and directed.

Plaintiffs allege that the film, entitled "100 DAYS IN SEPTEMBER," originally was endorsed by the Philippine government. Complaint ¶ .6. Upon its completion in 1975, however, the plaintiffs allege that the Philippine government, at defendant's direction, seized the film. Complaint ¶ .8. Plaintiffs further allege that repeated requests for the return of their film were refused, and in fact, that defendant arranged that plaintiffs be arrested on conspiracy charges. Complaint ¶¶ .9–12. Plaintiffs then fled the Philippines before they could be arrested. Complaint ¶ .13. At oral argument, counsel informed the court that the film recently had been returned to plaintiffs and at present is being shown throughout the Philippines.

As a result of defendant's actions, plaintiffs allege that they have suffered general damages for economic loss in the amount of $100 million; and physical and emotional damages in the amount of $5 million. Because of the alleged deliberate, vexatious and malicious nature of defendant's alleged actions, plaintiffs seek exemplary and punitive damages in the amount of $1 billion, in addition to costs and attorney's fees.

DISCUSSION

In support of his motion to dismiss, defendant has advanced several theories. However, because the instant matter may be resolved on either jurisdictional grounds or by application of the Act of State doctrine, it is not necessary to reach the issues of Head of State Immunity, Personal Jurisdiction or Forum non Conveniens.

A. JURISDICTION

The first issue a district court must address is whether it has jurisdiction to hear the lawsuit. In general, subject matter jurisdiction cannot be waived by the parties to a federal lawsuit. *See, e.g., Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). The plaintiff must affirmatively allege facts showing the existence of jurisdiction. Fed.R.Civ.P. 8(a)(1). If these facts are challenged, the burden is on the party claiming jurisdiction to demonstrate that the court has jurisdiction over the subject matter. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936). Unless jurisdiction exists, this court is powerless to afford any remedy to the plaintiffs.

In the instant action, the plaintiffs asserted only one basis for this court's jurisdiction in their complaint, *i.e.*, federal question jurisdiction under 28 U.S.C. § 1331. However, in their opposition to defendant's motion, plaintiffs also argue two other bases for this court's jurisdiction: first, under the diversity of citizenship statute, 28 U.S.C. § 1332; and second, under the Alien Tort Claims Act, 28 U.S.C. § 1350. Although plaintiffs have not properly pleaded these latter two theories, the court will discuss them, for I believe that this court does not have jurisdiction under any of the theories proffered by the plaintiff.

1. *Diversity Jurisdiction*

Neither defendant Marcos, nor either of the plaintiffs are citizens of the United States. For diversity of citizenship jurisdiction to exist under either 28 U.S.C. § 1332(a)(1) or 1332(a)(2), at least one of the litigants must be a "citizen" of a State. A person is a citizen of a State if (1) he or she is domiciled in that State, *AND* (2) he or she is a citizen of the United States. *Kantor v. Wellesley Galleries, Ltd.,* 704 F.2d 1088, 1090 (9th Cir.1983); 13B Wright & Miller, *Federal Practice And Procedure 2d* § 3611, at p. 507.

Since none of the parties to this lawsuit is a citizen of a State there is no diversity of citizenship jurisdiction.

2. *Federal Question Jurisdiction* (28 U.S.C. § 1331)

In their complaint, the plaintiffs contend that jurisdiction exists in this court because their First Amendment claim arises "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In the instant action, the plaintiffs, citizens of the Philippines, allege that defendant Marcos violated their First Amendment rights under the United States Constitution by conduct that occurred entirely within the Republic of the Philippines when defendant Marcos was President of the Philippines.

The United States Constitution does not apply to foreign officials acting within their own territory. *Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir. 1968). Therefore, plaintiffs' claim does not arise under the Constitution of the United States.

In addition, plaintiffs fail to allege any treaties of the United States under which their claim can be said to arise.

Finally, the plaintiffs are correct in asserting that the "laws" of the United States as defined in § 1331 include the Common Law, *Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972), and that the Common Law includes within it the "law of nations."

However, in the instant case, the plaintiffs have not alleged a private cause of action arising under the law of nations (*as I will discuss shortly*) that would enable them to recover against foreign nations for injury to themselves. Moreover, even where a federal question exists, the lack of a private cause of action, either express or implied, requires dismissal of the lawsuit. *Price v. Hawaii,* 764 F.2d 623, 628 (9th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 793, 88 L.Ed.2d 771.

In sum, the inquiry as to jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350, necessarily decides, in this case, the issue of federal question jurisdiction. If

Section 1350 confers a cause of action on the plaintiffs, then plaintiffs have a claim "arising under" Federal law. However, plaintiffs have not successfully raised any other source of a private cause of action under § 1331.

As plaintiffs have not alleged a cause of action under § 1350, it follows that under the facts of this case, jurisdiction does not exist under § 1331. In reaching this conclusion, I have relied on and applied the analysis of Judge Edwards contained at note 4 in *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 779–780 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

3. *Jurisdiction Under The Alien Tort Claims Act*

28 U.S.C. § 1350 provides:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

Section 1350 provides a right to an *alien,* if a *tort* has been committed against him or her in violation of a *treaty* of the United States, or the *"law of nations."*

In the instant action, as I have already observed, plaintiffs have alleged no treaty of the United States under which their claim can be said to have arisen. Therefore, if the plaintiffs are to have a claim under § 1350, it must arise under the "law of nations."

Section 1350 has been in existence since 1789, but it has been described by one judge as "a kind of Lohengrin; ... no one seems to know whence it came." *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975) (J. Friendly). Few courts have addressed the issue of what constitutes a "law of nations," and there is no universally accepted definition of this phrase. *Dreyfus v. Von Finck,* 534 F.2d 24, 30–31 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

However, in the *IIT* case, Judge Friendly, quoting from *Lopes v. Reederei Richard Schroder,* 225 F.Supp. 292, 297 (E.D. Pa.1963), posited the following as a "test" to aid in determining when a violation of the law of nations has occurred:

> [A] violation of the law of nations arises only when there has been 'a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se.*'

*IIT,* 519 F.2d at 1015.

Subsequently, courts held that the law of nations "deals primarily with the relationship among nations rather than among individuals," *Dreyfus, supra,* 534 F.2d at 30–31, or that "[i]f a controversy existing between individuals neither involves internal relations nor impinges upon a nation's exercise of its sovereignty, jurisdiction will not lie under [§ 1350]." *Cohen v. Hartman,* 634 F.2d 318, 319 (5th Cir.1981).

However, the Second Circuit in *Filartiga v. Pena-Irala,* 630 F.2d 876, 880 (1980), in holding that "an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations," qualified the test set out in *IIT v. Vencap:*

> We have no quarrel with this formulation so long as it be understood that the courts are not to prejudge the scope of the issues that the nations of the world may deem important to their interrelationships, and thus to their common good.

630 F.2d at 888.

*Filartiga* provides guidance insofar as it notes that the law of nations should be interpreted not as it was in 1789, but as it has evolved and exists among the nations of the world today, *Id.* at 881, and to the extent that international law today limits a state's power to torture. *Id.* at 885. However, there still is no consensus as to what constitutes a "law of nations."

This conclusion is perhaps best reflected in the District of Columbia's decision in

*Tel-Oren, supra,* 726 F.2d 774, in which all three judges of the panel wrote separately.

Despite this absence of consensus, I have relied on the opinion of Judge Edwards in *Tel-Oren* in reaching the conclusion that the plaintiffs have failed to assert conduct that constitutes a violation of the law of nations. Judge Edwards lists some representative violations of international law that are state-practiced, encouraged or condoned:

> (a) genocide; (b) slavery or slave trade; (c) the murder or causing the disappearance of individuals; (d) torture or other cruel, inhuman or degrading treatment or punishment; (e) prolonged arbitrary detention; (f) systematic racial discrimination; (g) consistent patterns of gross violations of internationally recognized human rights.

726 F.2d at 781. Although Judge Edwards did not attempt to determine whether each of these international law violations were indeed violations of the "law of nations," he did note that "commentators have begun to identify a handful of heinous actions—each of which violates definable, universal, and obligatory norms [citation omitted]—and in the process are defining the limits of section 1350's reach." *Id.*[1]

However dearly our country holds First Amendment rights, I must conclude that a violation of the First Amendment right of free speech does not rise to the level of such universally recognized rights and so does not constitute a "law of nations."

Accordingly, the plaintiffs cannot assert jurisdiction under § 1350. Since the § 1350 issue determines the issue of jurisdiction under § 1331 (federal question), and I have already ruled that plaintiffs cannot claim jurisdiction under diversity of citizenship, § 1332, this court does not have subject matter jurisdiction, and the complaint must be dismissed.

B. ACT OF STATE DOCTRINE

Even if jurisdiction could be asserted under one of the previously discussed statutory sections, I am convinced that the Act of State doctrine would require the dismissal of this action.

The Act of State doctrine forbids review by the United States courts of the acts of a foreign head of State acting in his official capacity. *DeRoburt v. Gannett Corp.,* 733 F.2d 701, 703 (9th Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).

In order for plaintiffs to assert jurisdiction under the Alien Tort Claims Act, they must allege that the tortious acts were official acts or acts committed under color of law. *See Filartiga, supra,* 630 F.2d 876. Moreover, it appears that plaintiffs' theory of liability is that Marcos in his capacity as President of the Philippines engaged in a systematic policy of suppressing rights of free speech in the Philippines. This theory of recovery requires precisely the type of inquiry in which the federal courts have refused to engage under the Act of State doctrine. It is beyond the capacity of the federal courts to subject the official acts or policies of the head of a foreign state to traditional standards of judicial review.

In sum, even if the plaintiffs had been able to claim jurisdiction, the Act of State doctrine would preclude this court from hearing the instant lawsuit.

This is not to say that I condone the acts that the plaintiffs have alleged in their

1. While there is no consensus on what constitutes a violation of the "law of nations," in one area there appears to be a consensus. A taking or expropriation of a foreign national's property by his government is not cognizable under § 1350. The Court in *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1397 (5th Cir.1985) stated:

> [T]he standards of human rights that have been generally accepted—and hence incorporated into the law of nations—are still limited. They encompass only such basic rights as the right not to be murdered, tortured, or otherwise subjected to cruel, inhuman or degrading punishment ... At present, the taking by a state of its national's property does not contravene the international law of minimum human rights.

complaint. As I noted earlier, this country, and I myself, hold First Amendment rights very dearly. Nevertheless, a violation of First Amendment rights simply does not rise to the level of a violation of a "law of nations." In the instant case, this court is thrust into the very sensitive area of international law. Reciprocity is a critical consideration. However much the acts of an official in another country may offend our sense of what is right, we are constrained to a large extent by the customs and usages of international law.

ACCORDINGLY, for the foregoing reasons, IT IS HEREBY ORDERED that the Defendant's Motion to Dismiss is GRANTED.

IT IS SO ORDERED.