25 F.3d 1467
 In re ESTATE OF FERDINAND MARCOS, HUMAN RIGHTS LITIGATION.
Maximo HILAO, et al., Class Plaintiffs; Vicente Clemente,
et al., Class Plaintiffs; Jaime Piopongco, et
al., Class Plaintiffs. Plaintiffs-Appellees,
v.
ESTATE OF Ferdinand MARCOS, Defendant-Appellant.
 No. 92-15526.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1993.
Decided June 16, 1994.
 
 Bernard J. Rothbaum, Jr., Linn & Helms, Oklahoma City, OK, for defendant-appellant.
 Robert A. Swift, Kohn, Savett, Klein & Graf, Philadelphia, PA, for plaintiffs-appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before: GOODWIN, TANG, and NOONAN, Circuit Judges.
 Opinion by Judge TANG.
 TANG, Senior Circuit Judge:
 
 OVERVIEW
 
 1
 Defendant Estate of Ferdinand Marcos ("the Estate") appeals from the district court's order preliminarily enjoining the Estate from transferring, secreting or dissipating the Estate's assets pendente lite. On this interlocutory appeal, the Estate also challenges the district court's subject matter jurisdiction under the Foreign Sovereign Immunities Act and Alien Tort Act, claims that the plaintiffs do not state a cause of action, and contends that any cause of action abated upon Marcos' death. We have jurisdiction and affirm.BACKGROUND
 
 
 2
 During Ferdinand Marcos' tenure as President of the Philippines, up to 10,000 people in the Philippines were allegedly tortured, summarily executed or disappeared at the hands of military intelligence personnel acting pursuant to martial law declared by Marcos in 1971. Military intelligence allegedly operated under the authority of Marcos, General Fabian Ver, and Imee Marcos-Manotoc (Ferdinand Marcos' daughter).
 
 
 3
 Marcos, his family, Ver and others loyal to Marcos fled to Hawaii in February, 1986. One month later, a number of lawsuits were filed against Marcos, Ver, and/or Imee Marcos-Manotoc, claiming that the plaintiffs had been arrested and tortured, or were the families of people arrested, tortured, and executed between 1971 and 1986.
 
 
 4
 All actions were dismissed by district courts on the "act of state" defense; we reversed and remanded in an unpublished decision. Hilao v. Marcos, 878 F.2d 1438 (9th Cir.1989); Trajano v. Marcos, 878 F.2d 1439 (9th Cir.1989) (table decisions). The Judicial Panel on Multi-District Litigation then consolidated all cases in the District of Hawaii on September 5, 1990. The case was certified as a class action on April 8, 1991, and a consolidated amended complaint naming the Estate as a defendant was filed on behalf of the class.
 
 
 5
 Default was entered against Imee Marcos-Manotoc in 1986 in Trajano v. Marcos, one of the individual cases consolidated in this action. In 1991, Marcos-Manotoc moved to set aside the default and moved to dismiss for lack of subject matter jurisdiction under the Alien Tort Act and immunity under the Foreign Sovereign Immunities Act. The motions were denied, and judgment was entered against Marcos-Manotoc. We affirmed on appeal. See Trajano v. Marcos (In re: Estate of Ferdinand E. Marcos Litigation), 978 F.2d 493 (9th Cir.1992) ("Estate I"), cert. denied, --- U.S. ----, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993).
 
 
 6
 On November 1, 1991, the plaintiffs moved for a preliminary injunction to prevent the Estate from transferring or secreting any assets in order to preserve the possibility of collecting a judgment. The Estate had earlier been enjoined from transferring or secreting assets in an action brought by the Republic of the Philippines against Ferdinand Marcos. That preliminary injunction had been appealed, and was affirmed. See Republic of Philippines v. Marcos, 862 F.2d 1355 (9th Cir.1988) (en banc), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). When the preliminary injunction in that case was dissolved due to a settlement, the plaintiffs in this action immediately sought the continuation of that injunction. The district court granted the motion.
 
 
 7
 Pending this interlocutory appeal of the preliminary injunction, trial on liability proceeded. On September 24, 1992, the jury rendered a verdict in favor of the class and the individually-named plaintiffs (except for plaintiff Wilson Madayag). The Estate's motion for JNOV was denied, and judgment was entered in favor of the prevailing plaintiffs. The preliminary injunction was modified on November 16, 1993, to set forth the jury verdict on liability, to compel the legal representatives of the Estate to fully and completely answer plaintiffs' interrogatories regarding the assets of the estate, to name the Swiss banks at which the Marcoses had deposited monies as representatives of the Estate, and to permit the plaintiffs to take discovery regarding these assets.
 
 
 8
 On February 23, 1994, the jury awarded the plaintiffs $1.2 billion in exemplary damages. The jury will reconvene to determine compensatory damages.
 
 DISCUSSION
 I. The Foreign Sovereign Immunities Act
 
 9
 The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Secs. 1330, 1602-11,[1] is the sole basis for obtaining jurisdiction over a foreign state and its agencies or instrumentalities.[2] Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989) ("Amerada Hess "). Subject matter jurisdiction against a foreign state depends on the existence of one of the exceptions to immunity set forth in FSIA. Estate I, 978 F.2d at 496, citing, Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). See also Liu v. Republic of China, 892 F.2d 1419, 1424 (9th Cir.1989), cert. dismissed, 497 U.S. 1058, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). The existence of subject matter jurisdiction under FSIA is a question of law reviewed de novo. Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 706 (9th Cir.1992) ("Siderman"), cert. denied, --- U.S. ----, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993).
 
 
 10
 The Estate argues that this action does not fall within any of the articulated exceptions to immunity and should therefore be dismissed. In particular, the Estate argues that under 28 U.S.C. Sec. 1605(a)(5)[3], a foreign state is immune to damages for personal injury or death unless it occurs in the United States. See Amerada Hess, 488 U.S. at 439, 109 S.Ct. at 690-91; McKeel v. Islamic Republic of Iran, 722 F.2d 582, 588 (9th Cir.1983), cert. denied, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).
 
 
 11
 However, we have previously rejected the Estate's argument that FSIA immunizes alleged acts of torture and execution by a foreign official. On appeal from entry of default judgment against Imee Marcos-Manotoc, we rejected Marcos-Manotoc's assertion that she was entitled to sovereign immunity because her challenged actions were premised on her authority as a government agent. Estate I, 978 F.2d at 497. In Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095 (9th Cir.1990), we had held that FSIA does not immunize a foreign official engaged in acts beyond the scope of his authority:
 
 
 12
 Where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do.
 
 
 13
 Id. at 1106 (quotation omitted). We held that upon default, Marcos-Manotoc admitted that she acted on her own authority, not that of the Republic of the Philippines. Her acts were not taken within any official mandate and were therefore not the acts of an agency or instrumentality of a foreign state within the meaning of FSIA. Estate I, 978 F.2d at 498.
 
 
 14
 Like Marcos-Manotoc, the Estate argues that Marcos' acts were premised on his official authority, and thus fall within FSIA. However, because the allegations of the complaint are taken as true for purposes of determining whether an action should be dismissed,[4] Siderman, 965 F.2d at 706, Marcos' actions should be treated as taken without official mandate pursuant to his own authority.
 
 
 15
 Further, we rejected the argument that Marcos' actions were "official" or "public" acts when we reversed the dismissal of the actions against Ferdinand Marcos on the "act of state doctrine." In Estate I, we explained:
 
 
 16
 This [conclusion that Marcos-Manotoc's acts were not taken pursuant to an official mandate] is consistent with our earlier decision that the same allegations against former President Marcos are not nonjusticiable "acts of state." See Trajano v. Marcos, 878 F.2d 1439 (9th Cir.1989) [table decision]. In so holding, we implicitly rejected the possibility that the acts set out in Trajano's complaint were public acts of the sovereign.
 
 
 17
 Id. at 498 n. 10.
 
 
 18
 Moreover, in Republic of the Philippines, we held that Marcos' alleged illegal acts were not official acts pursuant to his authority as President of the Philippines. We rejected the contention that the Republic's RICO suit against Marcos involved a nonjusticiable political question:
 
 
 19
 Although sometimes criticized as a ruler and at times invested with extraordinary powers, Ferdinand Marcos does not appear to have had the authority of an absolute autocrat. He was not the state, but the head of the state, bound by the laws that applied to him. Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law. As in the case of the deposed Venezuelan ruler, Marcos Perez Jimenez, the latter acts are as adjudicable and redressable as would be a dictator's act of rape.
 
 
 20
 Republic of the Philippines, 862 F.2d at 1361, citing Jimenez v. Aristeguieta, 311 F.2d 547 (5th Cir.1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963).
 
 
 21
 In Jimenez, the former dictator of Venezuela was charged in the United States with murder[5] and various financial crimes committed for personal gain in Venezuela. Jimenez, 311 F.2d at 552. The Fifth Circuit rejected Jimenez' argument that his acts were those of the sovereign because he was dictator, and therefore immunized under the "act of state" doctrine. The court stated:
 
 
 22
 Even though characterized as a dictator, appellant was not himself the sovereign--government--of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela. It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies.
 
 
 23
 Appellant's acts ... were not acts of Venezuelan sovereignty.... They constituted common crimes committed by the Chief of State done in violation of his position and not in pursuance of it. They are as far from being an act of state as rape which appellant concedes would not be an "Act of State."
 
 
 24
 Id. at 557-58 (citations omitted). In citing Jimenez with approval, we adopted its conclusion that the illegal acts of a dictator are not "official acts" unreviewable by federal courts.
 
 
 25
 Siderman does not dictate a contrary result. In that case, we held that Argentina's official acts of torture, though clearly constituting jus cogens[6] violations of international law, were immunized under FSIA. Siderman, 965 F.2d at 718. We noted that the Supreme Court in Amerada Hess had been "emphatic in its pronouncement 'that immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions,' " and concluded that "if violations of jus cogens committed outside the United States are to be exceptions to immunity, Congress must make them so." Id. at 719. However, Siderman was an action against the Republic of Argentina, which clearly fell within the "foreign state" scope of FSIA. In this case, the action is against the estate of an individual official who is accused of engaging in activities outside the scope of his authority. FSIA thus does not apply to this case.
 
 
 26
 This interpretation is consistent with FSIA's codification of the "restrictive" principle of sovereign immunity in international law, which limits the immunity of a foreign state to its "inherently governmental or 'public' acts," but does not extend to suits based on its commercial or private acts. Chuidian, 912 F.2d at 1099-1100. See also Siderman, 965 F.2d at 705-06 (reviewing history of foreign state immunity and the enactment of FSIA); McKeel, 722 F.2d at 587 n. 6. Immunity is extended to an individual only when acting on behalf of the state because actions against those individuals are "the practical equivalent of a suit against the sovereign directly." Chuidian, 912 F.2d at 1101. A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts.
 
 
 27
 This is evidenced by the Philippine government's agreement that the suit against Marcos proceed. The Minister of Justice of the Republic of the Philippines, Neptali A. Gonzales, prepared a letter to the Deputy Minister of Foreign Affairs, Leticia R. Shahani, concluding that "Marcos may be held liable for acts done as President during his incumbency, when such acts, like torture, inhuman treatment of detainees, etc. are clearly in violation of existing law ... the government or its officials may not validly claim state immunity for acts committed against a private party in violation of existing law." [Attachment 19a to Response Brief.] The Republic also filed an amicus curiae brief in the appeal from the dismissals on "act of state" grounds which urged the Ninth Circuit to reverse the district courts. The Republic stated that "foreign relations with the United States will not be adversely affected if these human rights claims against Ferdinand Marcos are heard in U.S. courts." [Attachment 22a, 35a to Response Brief.][7]
 
 
 28
 In conclusion, Marcos' acts of torture, execution, and disappearance were clearly acts outside of his authority as President. Like those of Marcos-Manotoc, Marcos' acts were not taken within any official mandate and were therefore not the acts of an agency or instrumentality of a foreign state within the meaning of FSIA.[8] Estate I, 978 F.2d at 498; Chuidian, 912 F.2d at 1106. No exception to FSIA thus need be demonstrated.
 
 
 29
 II. Subject matter jurisdiction under the Alien Tort Act
 
 
 30
 The Alien Tort Act, 28 U.S.C. Sec. 1350, enacted as part of the First Judiciary Act of 1789, provides:The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
 
 
 31
 In upholding the default judgment against Marcos-Manotoc, we held that a "suit as an alien for the tort of wrongful death, committed by military intelligence officials through torture prohibited by the law of nations, is within the jurisdictional grant of Sec. 1350." Estate I, 978 F.2d at 499. In so holding, we rejected all of the Estate's arguments now asserted on appeal.
 
 
 32
 The Estate contends that there is no jurisdiction pursuant to the "Arising Under" Clause of Art. III because 28 U.S.C. Sec. 1350 is purely a jurisdictional statute. In Estate I, we agreed that a jurisdictional statute could "not alone confer jurisdiction on the federal courts, and that the rights of the parties must stand or fall on federal substantive law to pass constitutional muster." Estate I, 978 F.2d at 501, citing Mesa v. California, 489 U.S. 121, 136-37, 109 S.Ct. 959, 968-69, 103 L.Ed.2d 99 (1989) and Verlinden, 461 U.S. at 495-97, 103 S.Ct. at 1972-73. However, we disagreed that there was no federal substantive law governing the dispute.
 
 
 33
 First, we concluded that even where FSIA was held inapplicable, there was federal subject matter jurisdiction by virtue of the required analysis of whether immunity would be granted under FSIA. Estate I, 978 F.2d at 501. This court stated:
 
 
 34
 [W]e have concluded that [Marcos-Manotoc's] actions were not those of the Republic of the Philippines for purposes of sovereign immunity under Chuidian. Nevertheless, when questions of sovereign immunity under the FSIA are raised, as they have been here, ... [u]nder Verlinden, subject-matter jurisdiction over this action satisfies Article III.
 
 
 35
 Id. at 502 (footnote omitted).
 
 
 36
 We also rejected the Estate's argument that international law does not provide a basis for federal court jurisdiction under Sec. 1350:
 
 
 37
 [T]he prohibition against official torture carries with it the force of a jus cogens norm, which enjoys the highest status within international law.... We therefore conclude that the district court did not err in founding jurisdiction on a violation of the jus cogens norm prohibiting official torture.
 
 
 38
 Estate I, 978 F.2d at 500 (internal quotations omitted), citing Siderman, 965 F.2d at 717. "It is ... well settled that the law of nations is part of federal common law." Id. at 502, citing The Paquete Habana, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction").
 
 
 39
 The Estate argues that we have held that "[i]nternational law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts," quoting United States v. Davis, 905 F.2d 245, 248 n. 1 (9th Cir.1990), cert. denied, 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). In Davis, the defendant appealed his conviction under the Maritime Law Drug Enforcement Act, after he was seized by the Coast Guard on the high seas. We stated that
 
 
 40
 [C]ompliance with international law does not determine whether the United States may apply the Act to his conduct. Only two restrictions exist on giving extraterritorial effect to Congress' directives. We require Congress [to] make clear its intent to give extraterritorial effects to its statutes. And secondly, as a matter of constitutional law, we require that application of the statute to the acts in question not violate the due process clause of the fifth amendment.
 
 
 41
 Davis, 905 F.2d at 248 (citations and footnote omitted). Davis thus dealt with the extraterritorial application of federal statutes that come into conflict with international law.
 
 
 42
 The Davis court cited United States v. Thomas, 893 F.2d 1066, 1068-69 (9th Cir.), cert. denied, 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d 53 (1990), for its conclusion that "[i]nternational law principles, standing on their own, do not create substantive rights." Davis, 905 F.2d at 248 n. 1. In Thomas, the defendant argued that 18 U.S.C. Secs. 2251-52, prohibiting child pornography, did not apply extraterritorially to his conduct in Mexico. We held that a penal statute may apply to extraterritorial acts absent a violation of due process. Id. at 1068. Further, we concluded that extraterritorial application would not violate international law: "[a]lthough Congress is not bound by international law in enacting statutes, out of respect for other nations, courts should not unnecessarily construe a congressional statute in a way that violates international law." Id. at 1069 (citations omitted). Thus, neither Davis nor Thomas held that international law is not a part of federal common law if there are no contradictory federal statutes.
 
 
 43
 The Estate also argues that the assertion of federal jurisdiction over an action between aliens regarding injuries occurring in a foreign nation violates Article III of the Constitution. We held in Estate I that there is "ample indication" that the "Arising Under" Clause was meant to apply to "all cases involving foreigners." Estate I, 978 F.2d at 502 (discussing papers of James Madison and Alexander Hamilton). The Estate nonetheless argues that early decisions regarding the interpretation of section 11 of the First Judiciary Act (the Diversity Clause), should control the interpretation of section 9 of the Act (the "Arising Under" Clause). In Mossman v. Higginson, 4 Dall. 12, 13, 1 L.Ed. 720 (1800), for instance, the Court stated:
 
 
 44
 [The] 11th section of the judiciary act can and must receive a construction consistent with the constitution. It says, it is true, in general terms, that the circuit court shall have cognisance of suits "where an alien is a party;" but ... the legislative power of conferring jurisdiction on the federal courts, is, in this respect, confined to suits between citizens and foreigners.
 
 
 45
 The Estate's argument that section 9 requires one of the parties to be a citizen was explicitly rejected by the Supreme Court in Verlinden. The Supreme Court held that "the 'Arising Under' Clause of Art. III provides an appropriate basis for the statutory grant of subject-matter jurisdiction to actions by foreign plaintiffs under the Act." Verlinden, 461 U.S. at 492, 103 S.Ct. at 1970. The Court reviewed the "controlling decision on the scope of Art. III 'arising under' jurisdiction," Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204 (1824), and concluded that it reflected
 
 
 46
 a broad conception of "arising under" jurisdiction, according to which Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law.... [A] suit against a foreign state under [FSIA] necessarily raises questions of substantive federal law at the very outset, and hence clearly "arises under" federal law, as that term is used in Art. III.
 
 
 47
 Verlinden, 461 U.S. at 492-93, 103 S.Ct. at 1971.[9] See also Chuidian, 912 F.2d at 1098 ("Federal courts have jurisdiction over suits against foreign sovereigns under [FSIA], even where the parties are not diverse and the underlying claims do not present a federal question") (citation to Verlinden omitted); Filartiga v. Pena-Irala, 630 F.2d 876, 878 (2d Cir.1980).
 
 
 48
 In conclusion, this action brought for torts "committed by military intelligence officials through torture prohibited by the law of nations, is within the jurisdictional grant of Sec. 1350." Estate I, 978 F.2d at 499. This exercise of jurisdiction does not violate Article III.
 
 III. Cause of action under the Alien Tort Act
 
 49
 The Estate argues that the Alien Tort Act is a purely jurisdictional statute which does not provide the plaintiffs a cause of action. The Estate contends that Sec. 1350, like the Sec. 1331 "arising under" jurisdictional provision, does not grant a cause of action. See Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951) (the "Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions").
 
 
 50
 However, in contrast to section 1331, "which requires that an action 'arise under' the laws of the United States, section 1350 does not require that the action 'arise under' the law of nations, but only mandates a 'violation of the law of nations' in order to create a cause of action." Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 779 (D.C.Cir.1984) (Edwards, J., concurring), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). It is unnecessary that international law provide a specific right to sue. International law "does not require any particular reaction to violations of law.... Whether and how the United States wished to react to such violations are domestic questions." Id., at 777-78 (quoting L. Henkin, Foreign Affairs and the Constitution 224 (1972)). "[N]othing more than a violation of the law of nations is required to invoke section 1350." Id. at 779.
 
 
 51
 Actionable violations of international law must be of a norm that is specific, universal, and obligatory. See Filartiga, 630 F.2d at 881; Tel-Oren, 726 F.2d at 781; cf. Guinto v. Marcos, 654 F.Supp. 276, 280 (S.D.Cal.1986) ("violation of the First Amendment right of free speech does not rise to the level of such universally recognized rights and so does not constitute a 'law of nations' "); see also Forti v. Suarez-Mason, 672 F.Supp. 1531, 1539-40 (N.D.Cal.1987) ("This 'international tort' must be one which is definable, obligatory (rather than horatory), and universally condemned"), amended in part, 694 F.Supp. 707 (N.D.Cal.1989).
 
 
 52
 Our reading of the plain text of Sec. 1350 is confirmed by the Torture Victim Protection Act of 1991, Pub.L. 102-256, 106 Stat. 78, codified at this section. See S.Rep. No. 249, 102d Cong., 1st Sess. 4-5 (1991); H.R.Rep. No. 367, 102d Cong., 1st Sess. pt. 1, reprinted in 1992 U.S.C.C.A.N. 84, 86.
 
 
 53
 The allegations in this case satisfy the specific, universal and obligatory standard. "Under international law, ... official torture violates jus cogens." Siderman, 965 F.2d at 717.
 
 
 54
 [T]he right to be free from official torture is fundamental and universal, a right deserving of the highest stature under international law, a norm of jus cogens. The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate. To subject a person to such horrors is to commit one of the most egregious violations of the personal security and dignity of a human being.
 
 
 55
 Id. See also Tel-Oren, 726 F.2d at 781 (Edwards, J., concurring) (torture is violation of customary international law); Tel-Oren, 726 F.2d at 819-20 (Bork, J., concurring) ("the proscription of official torture [is] a principle that is embodied in numerous international conventions and declarations, that is 'clear and unambiguous' ... and about which there is universal agreement 'in the modern usage and practice of nations' "); Filartiga, 630 F.2d at 880-84 (discussing declarations of the United Nations General Assembly, human rights conventions prohibiting torture, modern municipal law, and the works of jurists); Forti, 672 F.Supp. at 1541 (prohibition against official torture is "universal, obligatory, and definable"). The United States signed the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 39 U.N. GAOR Supp. (No. 51), 23 I.L.M. 1027 (1987), to which the United States Senate gave its advice and consent. Siderman, 965 F.2d at 716. The prohibition against summary execution or causing "disappearance" is similarly universal, definable, and obligatory. Forti, 672 F.Supp. at 1542, amended, 694 F.Supp. at 710-11.
 
 
 56
 We thus join the Second Circuit in concluding that the Alien Tort Act, 28 U.S.C. Sec. 1350, creates a cause of action for violations of specific, universal and obligatory international human rights standards which "confer[ ] fundamental rights upon all people vis-a-vis their own governments." Filartiga, 630 F.2d at 885-87.[10] The plaintiffs state a cause of action.
 
 IV. Abatement
 
 57
 The Estate argues that tort claims for personal injuries or wrongful death abate upon the death of either the plaintiff or the defendant. The Estate cites Heikkila v. Barber, 308 F.2d 558 (9th Cir.1962), in which this court held that the plaintiff's claim seeking to hold the defendant in contempt for wrongfully deporting the plaintiff, and seeking damages therefor, did not survive the plaintiff's death. The court held that Heikkila's claim most closely resembled the tort of unlawful imprisonment, false arrest, or trespass to his person, and at common law actions for tort did not survive the death of a party. Id. Refusing to apply state law for the survival of actions, the court stated, "A cause of action which is given by a federal statute, if no specific provision is made by act of Congress for its survival, survives or not according to the principles of the common law."[11] Id. at 561 (quotation omitted).
 
 
 58
 "The choice of law inquiry is ... primarily concerned with fairness." Filartiga, 630 F.2d at 889. Despite the fact that plaintiffs' cause of action arises under the Alien Tort Act, plaintiffs' claims are most closely analogous to a claim that government officials violated the Eighth Amendment right of freedom from cruel and unusual punishment, see Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (torture is prohibited by the Eighth Amendment), which does not abate upon the death of the defendant.[12] See Carlson v. Green, 446 U.S. 14, 24, 100 S.Ct. 1468, 1474-75, 64 L.Ed.2d 15 (1980) (a cause of action for an Eighth Amendment violation survives the death of a party). Alternatively, a Sec. 1350 action is closely analogous to a violation of 42 U.S.C. Sec. 1983. See Forti, 672 F.Supp. at 1546 ("Claims for tortious conduct of government officials under 28 U.S.C. Sec. 1350 may be analogized to domestic lawsuits brought under 42 U.S.C. Sec. 1983, where plaintiffs must allege both deprivation of a federally protected right and action 'under color of' state law."). A Sec. 1983 action also survives the death of a party. See Robertson v. Wegmann, 436 U.S. 584, 592, 98 S.Ct. 1991, 1996, 56 L.Ed.2d 554 (1978) (applying state survivorship law).
 
 
 59
 In conclusion, the plaintiffs' claims survive the death of Ferdinand Marcos.
 
 
 60
 V. Authority to preliminarily enjoin the Estate from transferring, secreting or dissipating the Estate's assets pendente lite
 
 
 61
 The grant of a preliminary injunction will be reversed only if the lower court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. Wilson v. Watt, 703 F.2d 395, 398 (9th Cir.1983). The Estate argues that the district court exceeded its authority in granting a preliminary injunction in a case seeking only money damages.[13]
 
 
 62
 It is unquestionable that it is within the district court's authority to issue a preliminary injunction where final equitable relief is sought. See Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559 (9th Cir.1992) ("the injunction is authorized by the district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief"). In fact, this court upheld the preliminary injunction entered in Republic of the Philippines v. Marcos, 862 F.2d 1355, to prevent Marcos (and subsequently, his Estate) from transferring or dissipating assets, and which these plaintiffs seek to continue. In that case, the Republic of the Philippines had brought a RICO suit against the Marcoses claiming that the Marcoses had converted public property to their own use, but also alleging a constructive trust. Id. at 1364. This court found that there was authority "to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." Id.
 
 
 63
 Indeed, some of our case law suggests that final equitable relief must be requested to authorize preliminary injunctive relief. See F.T.C. v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir.1982) ("Because the authority to issue a preliminary injunction rests upon the authority to give final relief, the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy."). However, to the extent that all of these cases involved equitable relief, any language is dicta which addressed the court's authority to issue a preliminary injunction where only money damages are sought.
 
 
 64
 In fact, there is support in our case law for the opposite conclusion. In Flynt Distributing Co. v. Harvey, 734 F.2d 1389 (9th Cir.1984), a preliminary injunction had been issued where the plaintiff had alleged that the defendant was planning to dispose of its business assets which would therefore be unavailable for levy of execution. Id. at 1391. We reversed the preliminary injunction, but not because only money damages had been sought. We pointed to evidence presented to the district court that the company purchasing the assets had agreed to indemnify the defendant for plaintiff's claim, and concluded "that the proposed sale to [the company] would have provided adequate protection to Flynt for any money damages it may obtain." Id. at 1395-96. The preliminary injunction was reversed because the district court had not found that money damages would be an inadequate remedy. Id. at 1394, citing Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1202 (9th Cir.1980) ("The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies."). Our decision thus implied that the traditional test for a preliminary injunction is applied in a case seeking money damages, and that if the plaintiff had demonstrated that the defendant's assets would be dissipated and no relief would otherwise be available, the preliminary injunction would have been appropriate.
 
 
 65
 The Supreme Court also has not directly decided this issue, although its precedent suggests that a preliminary injunction should be available where a remedy would be inadequate due to the dissipation of assets.
 
 
 66
 In De Beers Consolidated Mines, Ltd. v. United States, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), on which the Estate seeks to rely, the government brought a suit to enjoin future antitrust violations, and did not seek money damages for past violations. Id. at 219-20, 65 S.Ct. at 1133-34. The government sought a preliminary injunction to freeze the defendant's assets so that it could later have a practical means of enforcing a possible contempt sanction. The Court rejected the preliminary injunction as dealing "with a matter wholly outside the issues in the suit." Id. at 220, 65 S.Ct. at 1134.
 
 
 67
 The De Beers Court stated that granting the preliminary injunction in that case
 
 
 68
 would create a precedent of sweeping effect.... Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him.... And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestering his opponent's assets pending recovery and satisfaction of a judgment in such a law action.
 
 
 69
 De Beers, 325 U.S. at 222-23, 65 S.Ct. at 1135. However, the actual scope of the holding in De Beers is much narrower. See Reebok Int'l, 970 F.2d at 561 (labelling this passage dicta). As explained by the Third Circuit: "The preliminary injunction was inappropriate [in De Beers ] not because the plaintiff was seeking money damages ... the injunction was inappropriate precisely because the plaintiff could not recover any money damages." Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 195 (3d Cir.1990).
 
 
 70
 Further, in reaching its conclusion that the preliminary injunction dealt "with a matter wholly outside the issues in the suit," De Beers, 325 U.S. at 220, 65 S.Ct. at 1134, the De Beers Court distinguished the situation where an injunction is granted as to "a fund or property which could have been the subject of the provision of any final decree in the cause." Id. at 220, 65 S.Ct. at 1134, citing Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). In Deckert, the Supreme Court held that a preliminary injunction was authorized to maintain the status quo where the defendant was shown to be likely to be insolvent at the time of judgment. Id. at 290, 61 S.Ct. at 234. The plaintiffs in Deckert had also sought final equitable relief, and the Court in part upheld the injunction as a proper exercise of authority under section 22(a) of the Securities Act allowing a court to "enforce" liability, which "implies the power to make effective the right of recovery afforded by the Act." Id. at 288, 61 S.Ct. at 233. However, the Supreme Court's decision was not solely based on the fact that equitable or statutory relief had been sought: the Court generally held that "the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill," and concluded that the legal remedy against the defendant would be inadequate due to the allegations that the defendant was insolvent and the danger of dissipation of assets. Id. at 290, 61 S.Ct. at 234.[14] De Beers's citation to Deckert gives good reason to construe the dicta narrowly.
 
 
 71
 Moreover, in United States v. First National City Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965), the Supreme Court upheld a preliminary injunction freezing assets in a suit seeking payment of back taxes. Although there was statutory authority to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws," id. at 380, 85 S.Ct. at 529 (quoting 26 U.S.C. Sec. 7402(a)), the reasoning of the Court was much broader:
 
 
 72
 Once personal jurisdiction of a party is obtained, the District Court has authority to order it to "freeze" property under its control, whether the property be within or without the United States....
 
 
 73
 ....
 
 
 74
 The temporary injunction issued by the District Court seems to us to be eminently appropriate to prevent further dissipation of assets.... Unlike De Beers [citation omitted], there is here property which would be "the subject of the provision of any final decree in the cause." Id., [325 U.S. at] 220 [65 S.Ct. at 1134]. We conclude that this temporary injunction is "a reasonable measure to preserve the status quo" (Deckert [citation omitted].
 
 
 75
 First National City Bank, 379 U.S. at 384-85, 85 S.Ct. at 532. The preliminary injunction freezing assets was thus upheld in order to protect an eventual money judgment.
 
 
 76
 Most of the circuits have held that a preliminary injunction is available in these circumstances. In Hoxworth, 903 F.2d 186, the Third Circuit held that a preliminary injunction was authorized in "extraordinary circumstances" in a suit seeking only money damages, such as where there is a possibility that the defendant would be insolvent at the time of judgment. As in this case, the defendants in Hoxworth had argued "that a district court lacks the power to protect a potential future damages remedy by a preliminary injunction encumbering assets, even assuming that the usual criteria for obtaining a preliminary injunction are met." Id. at 189. The Third Circuit rejected that argument.
 
 
 77
 The First Circuit has also upheld a preliminary injunction entered in a lawsuit seeking money damages. In Teradyne Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir.1986), the court held that in a breach of contract action, it was within the district court's authority to enjoin the defendant from disposing of assets where there was danger that the defendant would be insolvent prior to judgment. Id. at 52-53. The court explicitly rejected the defendant's argument that injunctive relief could not be granted where only monetary relief was sought. Id. at 52. In support of its conclusion, the Teradyne court also cited Deckert.
 
 
 78
 In Roland Machinery Co. v. Dresser Industries, 749 F.2d 380 (7th Cir.1984), the court explained that a preliminary injunction would be appropriate in certain circumstances:
 
 
 79
 Where the only remedy sought at trial is damages, the two requirements--irreparable harm, and no adequate remedy at law--merge. The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages....
 
 
 80
 .... A damages remedy can be inadequate for any of four reasons:
 
 
 81
 (a) The damage award may come too late to save the plaintiff's business....
 
 
 82
 (b) The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy....
 
 
 83
 (c) Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected....
 
 
 84
 (d) The nature of the plaintiff's loss may make damages very difficult to calculate.
 
 
 85
 Id. at 386. The Seventh Circuit thus applied the traditional equitable test for the issuance of a preliminary injunction.
 
 
 86
 The Second, Fourth, Eighth, Tenth, and District of Columbia Circuits agree. See Green v. Drexler (In re: Feit & Drexler, Inc.), 760 F.2d 406, 416 (2d Cir.1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction.... this is an appropriate case for the issuance of injunctive relief to prevent [the defendant] from making uncollectible any judgment.") (internal quotations and citations omitted); United States ex rel. Taxpayers Against Fraud v. Singer Co., 889 F.2d 1327 (4th Cir.1989) (preliminary injunction preventing dissipation of assets permitted where plaintiffs allege that defendant is insolvent and where its assets are in danger of dissipation and depletion; defendant's argument that attachment proceedings under Fed.R.Civ.P. 64 were instead appropriate construed "too narrowly the Supreme Court's approval of the exercise of general equitable power to protect a plaintiff's right to recovery"), citing Deckert, 311 U.S. at 285, 61 S.Ct. at 231-32; Airlines Reporting Corp. v. Barry, 825 F.2d 1220, 1227 (8th Cir.1987) (holding in civil RICO, fraud, and conversion case that, "[t]he authority of a trial court to issue a preliminary injunction to ensure the preservation of an adequate remedy is well established"; plaintiff demonstrated that the defendants would not satisfy award of damages and is "entitled to a preliminary injunction to protect its remedy"), citing Deckert, 311 U.S. at 290, 61 S.Ct. at 234, Teradyne, 797 F.2d at 52, and Roland, 749 F.2d at 386; Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir.1986) (preliminary injunction warranted where irreparable harm would result from inability to collect money judgment); Foltz v. U.S. New & World Report, 760 F.2d 1300, 1309 (D.C.Cir.1985) (upholding authority of district court in ERISA action to enjoin pay-out of all assets because "an equitable remedy designed to freeze the status quo ... would be entirely in keeping with the principles that undergird equity jurisprudence").
 
 
 87
 The Fifth and Eleventh Circuits have held to the contrary. In Dixie Carriers, Inc. v. Channel Fueling Service, Inc. (In re: Fredeman Litigation), 843 F.2d 821 (5th Cir.1988), the court held "the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment." Id. at 824. Reviewing the De Beers decision, the court concluded that a claim for money damages is not "related to" the underlying litigation because the plaintiffs did not seek the return of a particular asset or fund that had been used to violate a statute. Id. at 825.[15] See also Mitsubishi Int'l Corp. v. Cardinal Textile Sales, 14 F.3d 1507 (11th Cir.1994) (recharacterizing preliminary injunction freezing assets to preserve judgment as writ of attachment, for which state law did not provide authority).
 
 
 88
 We join the majority of circuits in concluding that a district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment. This holding is thus restricted to only extraordinary cases in which equitable relief is not sought. Our conclusion thus avoids the concern in De Beers of the "sweeping effect" that a plaintiff in any action requesting damages can apply for an injunction to sequester his or her opponent's assets. 325 U.S. at 222-23, 65 S.Ct. at 1135.
 
 
 89
 In its findings supporting the preliminary injunction, the district court found a substantial likelihood that plaintiffs would succeed on the merits. In fact, the plaintiffs have since prevailed at trial on liability and have been awarded substantial exemplary damages. The court further found that plaintiffs would be irreparably injured and that the remedies at law were not adequate if the injunction were denied, concluding that there was substantial danger that the defendants would transfer or conceal its funds, resulting in denying recovery to the plaintiffs. In support of this conclusion, the district court found (1) that an ultimate judgment would likely exceed $320 million, (2) that the Estate has about $320 million in assets in banks in Switzerland and Hong Kong, (3) that the Trajano plaintiffs have been unable to execute upon Imee Marcos-Manotoc's assets to collect the $4.4 million judgment, (4) that federal courts have twice enjoined the Marcoses from transferring or secreting assets, based on a pattern and practice of secreting assets through foreign bank accounts by the use of aliases and shell corporations, see Republic of the Philippines v. Marcos, 862 F.2d 1355 (9th Cir.1988), and Republic of the Philippines v. Marcos, 806 F.2d 344 (2d Cir.1986), cert. dismissed, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784; cert. denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), and (5) that no probate proceedings had been opened for Ferdinand Marcos. The court further found that the Estate would not be harmed by the injunction because the Estate cannot distribute its assets until claims against it are resolved, the assets of the Estate may continue to be invested, and that the balance of hardships tips sharply in favor of issuance of the injunction. The Estate does not challenge these findings.
 
 
 90
 The district court did not abuse its discretion in preliminarily enjoining the Estate from transferring, secreting or dissipating the Estate's assets pendente lite. The district court applied correct law, and its factual findings (not challenged by the Estate) support the conclusion that money damages would be an inadequate remedy due to evidence that the Estate has engaged in a pattern of secreting or dissipating assets to avoid judgment.
 
 
 91
 AFFIRMED.
 
 
 
 [1]
 Section 1330 states in relevant part:
 (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
 Section 1604 provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."
 "Sections 1604 and 1330(a) work in tandem: Sec. 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and Sec. 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989).
 
 
 [2]
 Section 1603(b) defines "agency or instrumentality" as a separate legal person which is an organ or political subdivision of a foreign state. This may include individuals acting in their official capacity. Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1099-1103 (9th Cir.1990)
 
 
 [3]
 Section 1605 sets out "general exceptions to the jurisdictional immunity of a foreign state." Section 1605(a)(5) provides that a foreign state is not immune where "money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."
 
 
 [4]
 The complaint alleges, inter alia, that "Marcos under color of law, ordered, orchestrated, directed, sanctioned and tolerated the continuous and systematic violation of human rights of plaintiffs and the class through the military, para-military and intelligence forces he controlled"; that at "the direction or with the approval of Marcos, plaintiffs and about 10,000 class members were arrested without cause, held incommunicado and routinely subjected to 'tactical interrogation,' a euphemism for torture during interrogation"; that following tactical interrogation "many class members were arbitrarily detained for a year or more with Marcos' authorization and approval"; and that over 2,000 class members were summarily executed. [CR 3 at 13-14]. Further, the complaint alleges that these actions were violations of international law and the constitution and law of the Philippines
 
 
 [5]
 The court found no probable cause to support the murder charges. Id. at 552
 
 
 [6]
 "[A] jus cogens norm, also known as a 'peremptory norm' of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Siderman, 965 F.2d at 714, quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679
 
 
 [7]
 The plaintiffs argue that these submissions constitute a waiver of sovereign immunity under FSIA by the Republic of the Philippines, and that Marcos' derivative immunity is thus also waived. The Estate objects that neither of these documents contain an explicit "waiver" of immunity, and that there is no authority allowing one government official to waive the immunity of another official. See Chuidian, 912 F.2d at 1103-05 (waiver by one Philippine governmental entity does not extend to a different entity). It is unnecessary to reach this issue, in view of the conclusion that FSIA does not immunize the illegal conduct of government officials. See Estate I, 978 F.2d at 498 n. 11 (finding it unnecessary to reach the waiver of immunity issue)
 
 
 [8]
 We also reject the Estate's argument that because "only individuals who have acted under official authority or under color of such authority may violate international law," Estate I, 978 F.2d at 501-02, a finding that Marcos' alleged actions were outside the scope of his official authority necessarily leads to the conclusion that there was no violation of international law. An official acting under color of authority, but not within an official mandate, can violate international law and not be entitled to immunity under FSIA. See Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir.1980) ("Paraguay's renunciation of torture as a legitimate instrument of state policy, however, does not strip the tort of its character as an international law violation, if it in fact occurred under color of government authority.")
 
 
 [9]
 In McKeel we held that FSIA did not provide a basis for "arising under" jurisdiction pursuant to 28 U.S.C. Sec. 1331. See McKeel, 722 F.2d at 586 ("FSIA, however, does not affect the substantive law of liability ... and therefore does not provide a basis for statutory 'arising under' jurisdiction"). However, the "Arising Under" Clause of Art. III is construed more broadly than the same clause in 28 U.S.C. Sec. 1331. Estate I, 978 F.2d at 502. See also Verlinden, 461 U.S. at 495, 103 S.Ct. at 1972
 
 
 [10]
 Though not raised by the parties, the plaintiffs may also state a cause of action for violations of municipal law. See Estate I, 978 F.2d at 503 (Trajano's claims against Marcos-Manotoc arose under wrongful death statutes as well as international law). See generally Tel-Oren, 726 F.2d at 782-88 (Edwards, J.) (substantive right could be derived from the domestic tort law of the United States if there is a nexus between the international tort providing jurisdiction and the domestic law tort providing the cause of action, and if limited to actions constituting universal crimes, domestic torts committed within the United States and injuring rights under international law, and torts committed by United States citizens abroad). We do not decide this issue
 
 
 [11]
 Heikkila's cause of action arose from the federal statute granting damages resulting from contempt, 18 U.S.C. Secs. 401 and 402
 
 
 [12]
 While the Constitution itself does not apply to aliens whose claims arise outside the United States, United States v. Verdugo-Urquidez, 494 U.S. 259, 268, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), we may employ this analogy for purposes of abatement
 
 
 [13]
 Final equitable relief was not sought in this case. The class action complaint merely requests an injunction against the transfer of assets in count two, based on allegations that the assets of the Estate will be transferred or secreted to avoid payment of a judgment
 
 
 [14]
 "[I]n light of the Court's generic use of the word 'legal'.... the Court justified the injunction as reasonably necessary to preserve the status quo, and thus to ensure the satisfiability of a potential future judgment ordering the transfer of money from defendant to plaintiffs--whether it be deemed legal or equitable in nature." Hoxworth, 903 F.2d at 196
 
 
 [15]
 However, the Fifth Circuit's rulings on this point are somewhat inconsistent. See Federal Savings & Loan Corp. v. Dixon, 835 F.2d 554, 560 n. 1 (5th Cir.1987) ("We are unwilling to say that no circumstances could support an injunction to secure a legal remedy.... difficulty in collecting a damage judgment may support a claim of irreparable injury."), citing Tri-State Generation, 805 F.2d at 355. See also Productos Carnic v. Central American Beef and Seafood Trading Co., 621 F.2d 683, 686 (5th Cir.1980) ("even were [the] remedy limited to damages, an injunction may issue to protect that remedy"). The Fredeman court labelled this statement in Productos Carnic dicta in view of the equitable nature of that case. 843 F.2d at 827