**In re ESTATE OF FERDINAND MARCOS HUMAN RIGHTS LITIGATION.**

**Maximo HILAO, Class Plaintiffs, Plaintiffs–Appellees,**

v.

**ESTATE OF Ferdinand MARCOS, Defendant,**

**Republic of the Philippines, a non-party specifically identified as subject to the preliminary injunction, Appellant.**

**In re ESTATE OF FERDINAND MARCOS HUMAN RIGHTS LITIGATION.**

**Maximo HILAO, Class Plaintiffs, Plaintiffs–Appellees,**

v.

**ESTATE OF Ferdinand MARCOS, Defendant,**

**Republic of the Philippines, a non-party specifically identified as subject to the preliminary injunction, Appellant.**

**Nos. 94–16739, 95–15259.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1995 in No. 94-16739.

Submitted June 18, 1996 * in No. 95-15259.

Decided Aug. .22, 1996.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, California, for appellant in Nos. 94-16739, 95-15259.

Robert A. Swift, Kohn, Swift & Graf, Philadelphia, Pennsylvania, and Jon M. Van Dyke, Honolulu, Hawaii, for plaintiffs-appellees in Nos. 94-16739, 95-15259.

John Schnitker, United States Department of Justice, Washington, DC, for the amicus in No. 94-16739.

Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.

FLETCHER, Circuit Judge:

These appeals concern whether a United States court properly enjoined the Republic of the Philippines from entering into agreements with the Estate of former Philippine President Ferdinand Marcos to transfer to the Philippines assets of the Estate that the Republic asserts were looted from the Philippines treasury. The plaintiff class ("Hilao"), a group of 10,000 people who allege that they or their relatives were tortured or executed by Marcos, was awarded almost $2 billion in damages from the Estate in federal district court in Hawai'i. Hilao sought the injunction to protect the Estate's assets in order to enforce its judgment.

On appeal, the Republic claims sovereign immunity, asserts an Act of State defense, and contends that the district court erred in designating it an aider and abettor of the Estate.

We have jurisdiction over the appeal from the preliminary injunction under 28 U.S.C.

§ 1292(a) and over the appeal from the permanent injunction under 28 U.S.C. § 1291. We hold that the Republic is entitled to sovereign immunity.

## BACKGROUND

Shortly after being deposed as president of the Philippines in February 1986, Ferdinand Marcos ("Marcos") and his wife Imelda fled to Hawai'i, taking with them dozens of crates filled with gold, jewelry, and cash. President Corazon Aquino, who replaced Marcos as president, created the Presidential Commission on Good Government, an official agency charged with recovering the assets of the Republic from the Marcos family and its associates.

These assets, which have never been comprehensively identified in any litigation, originally included U.S. and Philippine real estate holdings, valuable art works, cash and other property seized by U.S. Customs officials in Hawai'i, and funds in bank accounts in California and Switzerland. The Republic contends that the Marcoses and their associates obtained these assets through misuse of Marcos' official position, and Philippine law provides for the forfeiture to the national treasury of property unlawfully obtained by public officials.

A number of lawsuits were filed against the Marcos family in American courts. Among them were five suits filed in the Northern District of California and the District of Hawai'i by individuals alleging that they or their relatives had been arrested, tortured, or executed by military intelligence personnel acting pursuant to martial law declared by Marcos in 1971. *Hilao v. Estate of Ferdinand Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.)*, 25 F.3d 1467, 1469 (9th Cir.1994) ("*Estate II*"), *cert. denied*, —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995). The district courts dismissed all five suits on the ground that the Act of State doctrine precluded liability. *Id.*

In an appeal of those decisions to this court, the Republic filed an amicus curiae brief urging the U.S. courts to exercise jurisdiction over the human rights claims. This court reversed in two unpublished decisions.[1] The human rights cases were subsequently consolidated in the district court in Hawai'i and certified as a class action suit against the Estate. 25 F.3d at 1469.

Meanwhile, in a separate action filed in the Central District of California, the Republic sued the Estate and Imelda Marcos, asserting RICO and pendent state law claims, and seeking the recovery of $1.55 billion allegedly plundered from the Philippines treasury. *Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1476 (9th Cir.1987), *reheard en banc*, 862 F.2d 1355 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). On 25 June 1986, the district court enjoined the Marcoses and their associates from disposing of any assets anywhere in the world. We affirmed the injunction. 862 F.2d at 1358.

The Republic's suit against the Estate was settled in October 1991 and dismissed on 4 November 1991. As part of the settlement, the Estate and Imelda Marcos agreed to transfer the Estate assets impounded by U.S. Customs officials in Hawai'i,[2] except for some personal items and the cash in three accounts at a Los Angeles bank,[3] to the Republic.[4]

---

1. *Hilao v. Marcos*, 878 F.2d 1438 (9th Cir.1989), and *Trajano v. Marcos*, 878 F.2d 1439 (9th Cir. 1989).

2. The Republic presented evidence that the Marcoses transported to Hawai'i stolen cash, negotiable instruments, jewels, and other property worth $8.2 million. *Republic of the Philippines v. Marcos*, 862 F.2d at 1362. The property included 22 crates of currency that were immediately impounded by the U.S. Customs Service. *Republic of the Philippines v. Marcos*, 818 F.2d at 1475, *reheard en banc*, 862 F.2d 1355 (9th Cir. 1988). The Central Bank of the Philippines filed suit in Hawai'i to recover the cash, negotiable instruments, and gold in the crates. *Republic of the Philippines v. Marcos*, Civil No. 86–0155 (D.Haw. July 18, 1986).

3. The Republic alleged that the Marcoses maintained deposits of more than $800,000 in these accounts. 862 F.2d at 1358.

4. At oral argument, the Republic denied that any Estate assets remain in this country.

The assets in Swiss banks were not transferred under the terms of the settlement, perhaps because the Swiss courts had frozen all Marcos assets in Switzerland in 1986 at the request of the Republic and had agreed that the assets would be returned to the Philippines if criminal prosecutions against the Marcos family in the Philippines succeeded.[5]

The injunction freezing the Estate's assets was dissolved as part of the settlement. However, the district court in Hawai'i granted Hilao's request to have the injunction reinstated on 19 November 1991. *Estate II,* 25 F.3d at 1469. We upheld the injunction on 16 June 1994. *Id.* at 1468. In the meantime, Hilao had won a favorable liability verdict on 24 September 1992. *Id.* at 1469. On 23 February 1994, the jury awarded Hilao $1.2 billion in punitive damages. *Id.*

On 20 July 1994, Hilao filed a motion to modify the injunction to identify the Republic as an agent, representative, aider or abettor of the Estate subject to the injunction. Hilao contended that the Republic had seized assets of the Estate in the Philippines worth $672 million, as well as $2 million of the $409 million in cash that the Estate had deposited in Swiss banks. It claimed that the Republic had sold $481 million worth of stock, held in the Meralco Foundation for the benefit of the Estate, and had appropriated the proceeds to itself. It also asserted that the Republic and the Estate entered into two agreements on 26 June 1992, to transfer works of art[6] from the United States to the National Museum of the Philippines, and to divide the Estate's other assets between the Estate and the Republic.

On 12 September 1994, the district court heard argument on the motion; the Republic appeared specially and asserted its sovereign immunity. The district court the following day issued an order identifying the Republic as a "representative, agent, aider or abettor" of the Estate, and subjecting it to the injunction. On 23 September 1994, the Republic filed an appeal (No. 94–16739) from this order.

On 18 January 1995, a jury in Hawai'i awarded Hilao $766 million in compensatory damages. On 3 February 1995, the district court entered a final judgment, which included a permanent injunction against the Estate and its "aiders and abettors" and a finding that the Republic is an aider and abettor of the Estate. On 6 February 1995, the Republic filed a notice of appeal (No. 95–15259) from this final judgment.

## STANDARDS OF REVIEW

 We review a district court's grant of permanent injunctive relief for an abuse of discretion or application of erroneous legal principles. *United States v. Yacoubian,* 24 F.3d 1, 3 (9th Cir.1994). The existence of jurisdiction under the Foreign Sovereign Immunities Act is a question of law reviewed *de novo. Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 706 (9th Cir.1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993).

## DISCUSSION

### No. 94–16739

This interlocutory appeal by the Republic from the district court's preliminary injunction was argued and submitted in February 1995. While the appeal was pending, the Republic appealed, in No. 95–15259, from the permanent injunction issued by the court in its final judgment. The Republic then moved to consolidate the appeals, while Hilao moved to dismiss appeal No. 94–16739 as moot. On May 30, 1996, we ordered the appeals consolidated, and we now dismiss the appeal as moot.

---

**5.** On June 7, 1994, Switzerland informed the State Department that the Swiss order freezing the Estate's assets takes precedence over the Hawai'i District Court's injunction. Switzerland contended that the U.S. courts lacked jurisdiction over the Swiss assets, and that Switzerland would no longer consider the assets as belonging to the Estate if the Philippines courts were to

determine that the assets belonged to the Republic. Addendum to Brief of the United States as Amicus Curiae.

**6.** These include works by Pierre Augusta Renoir and Henri Matisse, as well as numerous native paintings and 400 icons.

■ "[W]here a permanent injunction has been granted that supersedes the original preliminary injunction, the interlocutory injunction becomes merged in the final decree and the appeal from the interlocutory preliminary order is properly dismissed." *Continental Training Services, Inc. v. Cavazos,* 893 F.2d 877, 880 (7th Cir.1990) (internal quotation marks, emendations, and citations omitted). *See also Smith v. Illinois Bell Tel. Co.,* 270 U.S. 587, 588–89, 46 S.Ct. 408, 408–09, 70 L.Ed. 747 (1926) (appeal from interlocutory injunction dismissed where injunction became merged in final decree, appeal of which was also pending before Court); *Burbank–Glendale–Pasadena Airport Auth. v. City of Los Angeles,* 979 F.2d 1338, 1340 n. 1 (9th Cir.1992) ("Once an order of permanent injunction is entered, the preliminary injunction merges with it and appeal may be had only from the order of permanent injunction."); *Securities and Exch. Comm'n v. Mount Vernon Memorial Park,* 664 F.2d 1358, 1361–62 (9th Cir.), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982) (dismissing appeal from denial of preliminary injunction where district court subsequently dismissed relevant count of complaint for failure to state a claim and appeal of that dismissal was before the court); *Securities and Exch. Comm'n v. Murphy,* 626 F.2d 633, 637 n. 1 (9th Cir.1980) ("Because the [district] court later entered a permanent injunction, which we affirm, the appeal from the grant of a preliminary injunction is moot."); *Moore Dry Dock Co. v. Pillsbury,* 98 F.2d 115 (9th Cir.1938) (same). We therefore dismiss the appeal in No. 94–16739 as moot.

### No. 95–15259

#### I. Standing

Hilao asserts that the Republic lacks standing to appeal the injunction because it is neither a party nor an intervenor, and there has been no enforcement action against it. The permanent injunction, however, finds as a matter of fact that the Republic is "an agent, representative, aider or abettor of the Estate" and expressly enjoins not only the Estate but also "its agents, representatives, aiders and abettors". Thus, the court clearly expressed its view that the injunction binds the Republic. Hilao seems to want to have it both ways. On the one hand, it asserts that the Republic has no standing to appeal because it has not been harmed by the injunction. On the other hand, it contended at oral argument that the Republic could be cited for contempt if it were to violate the injunction.[7]

■ The injunction clearly confronts the Republic with the choice of either conforming its conduct to the dictates of the injunction or ignoring the injunction and risking contempt proceedings. This constitutes sufficient injury-in-fact to give the Republic standing to challenge the injunction even in the absence of an actual finding of contempt against it. *See, e.g., Associated Business Tel. Sys. Corp. v. Greater Capital Corp.,* 861 F.2d 793, 796 (3d Cir.1988) (preliminary injunction appealable if failure to comply would be enforced by contempt proceeding).

#### II. Sovereign Immunity

The Republic claims that the district court lacked authority to subject it to the injunction because it enjoys sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–11 ("FSIA"). Hilao argues that the FSIA does not govern because Rule 65(d) of the Federal Rules of Civil Procedure[8] makes an injunction binding upon "those persons in active concert or

**7.** Hilao took the same position before the district court when it originally sought the modification of the injunction:

We don't seek at this time to make them a party, and we don't seek to hold them in contempt. We seek at this time merely an interim step whereby they will be identified to the injunction as a responsible party under Rule 65(d). And should they continue to act in violation of that injunction with notice and in concert with the Marcoses, then at that time—at that later time, we then may seek to hold them in contempt.
Transcript of Proceedings, 12 September 1994, at 39.

**8.** Federal Rule of Civil Procedure 65(d) reads in relevant part:

**Form and Scope of Injunction or Restraining Order.** Every order granting an injunction

participation with" an enjoined party to the action where those persons have actual notice. Therefore, Hilao argues, the district court did not need to establish personal jurisdiction over the Republic in order to find that the Republic is an aider and abettor of the Estate and therefore bound by the injunction.

While Rule 65(d) indeed automatically makes the injunction against the Estate binding upon persons "in active concert or participation with" the Estate who have actual notice of the injunction, the district court went further by specifically finding that the Republic is such a person and thus expressly binding it by the injunction. However, in order to enforce this injunction against the Republic, through, for example, contempt proceedings, the district court would have to have personal jurisdiction over the Republic. *See Reebok Int'l Ltd. v. McLaughlin,* 49 F.3d 1387 (9th Cir.) (contempt order and assessment of $2.6 million in sanctions reversed where district court lacked personal jurisdiction over contemnor), *cert. denied,* —— U.S. ——, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995). *See also* 17 C.J.S. Contempt § 64 ("It is essential to the power to punish for contempt that the court ... have jurisdiction of the person."); 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2960 (1995) ("[W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, that party must be served with process as in any other civil action."). An injunction against the Republic in the absence of personal jurisdiction over it would be futile, as the court would be powerless to enforce its injunction.

■ A court should not issue an unenforceable injunction: "The rule that a 'court of equity will not issue an unenforceable decree of injunction' comprehends [as a] reason[ ] for denying injunctive relief[ ] that the court ... does not have the means to punish disobedience once discovered." *Hamilton v. MacDonald,* 503 F.2d 1138, 1146 (9th Cir. 1974) (quoting "Developments in the Law—Injunctions", 78 Harv. L.Rev. 994, 1012 (1965)) (internal quotation marks omitted). *See also Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 550, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937) ("[A] court of equity may refuse to give any relief when it is apparent that that which it can give will not be effective or of benefit to the plaintiff."); *National Labor Relations Bd. v. Family Heritage Home–Beaver Dam, Inc.,* 491 F.2d 347, 351 (7th Cir.1974) ("Ordinarily a court would not grant an injunction requiring affirmative action in the face of a serious assertion that the decree will be meaningless because it can no longer be carried out, without inquiry into the truth of such assertion."); 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2945 ("[T]he court may decide that it lacks the necessary power to enforce a decree so that issuing one might prove to be a futile gesture.").

■ In order to determine whether the attempt to enjoin the Republic was futile, we must examine whether the district court could have personal jurisdiction over the Republic. The FSIA is the sole basis for jurisdiction over a foreign state.[9] *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). Personal jurisdiction over a foreign state depends on subject-matter jurisdiction over the action against the foreign state under the FSIA. 28 U.S.C. § 1330(b). "[P]ersonal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in

... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

9. Hilao suggests that the All Writs Act, 28 U.S.C. § 1651, authorized the court to take steps to effectuate the court's previous orders. However, the All Writs Act "is a residual source of authori-

ty to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Pennsylvania Bureau of Correction v. United States Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985). Here, Federal Rule of Civil Procedure 65(d) and the FSIA specifically address the issue at hand and thus are controlling.

[the FSIA] applies." *Id.* at 428, 435 n. 3, 109 S.Ct. at 683, 688 n. 3 (1989).

The FSIA sets forth the general rule that foreign states are immune from the jurisdiction of courts in the United States unless a claim against them falls within an exception to immunity under the Act. *Siderman de Blake,* 965 F.2d at 706. Thus, the district court lacked jurisdiction over the Republic absent the existence of an applicable exception under the FSIA.

■ Hilao claims that both the commercial activity and waiver exceptions of the FSIA apply. Once a plaintiff offers evidence that one of the FSIA's exceptions to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply. *Joseph v. Office of the Consulate Gen. of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988).

## A. Commercial-Activity Exception

The FSIA directs that a foreign state is not immune from suit in U.S. courts if:

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

■ The commercial character of an activity "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). "[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992). "[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Id.* The central question is "whether the activity is of a kind in which a private party might engage." *Joseph,* 830 F.2d at 1024.[10]

■ Hilao argues that the Republic is attempting to recover indebtedness, while the Republic describes itself as pursuing misappropriated public assets. The Republic's description is more accurate, in that a governmental agency of the Philippines is acting under a statutory mandate to recover property allegedly stolen from the treasury. This exercise of police power is a governmental rather than commercial activity, and, thus, the commercial-activity exception does not apply.

## B. Waiver Exception

■ A foreign state is not immune from suit if it "has waived its immunity either explicitly or by implication...." 28 U.S.C. § 1605(a)(1). "The FSIA's waiver exception 'is narrowly construed.'" *Siderman de Blake,* 965 F.2d at 720 (quoting *Joseph,* 830 F.2d at 1022). "[C]ourts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

■ The House Report does not purport to provide an exclusive list of the circum-

---

**10.** As examples of commercial activity, Congress cited "the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation"; "a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building ... [or] to make repairs on an embassy building"; "sale of a service or a product"; "leasing of property"; "borrowing of money"; and "investment in a security of an American corporation." H.R.Rep. No. 1487, 94th Cong.2d Sess. 16 (1976) *reprinted in* 1976 U.S.C.C.A.N. 6604, 6614–15.

stances giving rise to implied waiver. *Siderman de Blake*, 965 F.2d at 721. However, to support a finding of implied waiver, there must exist a direct connection between the sovereign's activities in U.S. courts and the plaintiff's claims for relief. *Id.* at 722.

Hilao argues that the Republic waived immunity by (1) submitting the amicus curiae brief in *Trajano* and *Hilao* and (2) using the U.S. courts to pursue assets held by the Estate.

### 1. Amicus Curiae Brief

Hilao asserts that the amicus brief represents the Republic's agreement "that the law of a particular country should govern." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

In the amicus brief, the Republic argued that the Act of State defense did not apply to Hilao's claims against Marcos because the claims concerned allegedly illegal acts. It urged this Court to permit the suit to proceed in American courts, stating, "The Government of the Philippines can state without hesitation or reservation that its foreign relations with the United States will *not* be adversely affected if these human rights claims against Ferdinand Marcos are heard in U.S. courts; and, in fact, relations may well be improved if Filipino citizens see that justice is available in U.S. courts."

█ Submission of the brief does not constitute an implied waiver of immunity. The brief related to damages claims against the Estate rather than to potential relief from the Republic. Regardless of the Republic's wisdom in encouraging a lawsuit that may eventually lead to little or no recovery for the plaintiffs in large part because of the Republic's own subsequent actions, it nonetheless can legitimately claim that its position in the amicus brief was consistent with and unrelat-

ed to the actions it has taken to recover assets held by the Estate. In pursuing the assets, the Republic sought property to which it felt it was legally entitled. In lending support to the Hilao litigation, it merely stated that Hilao should be permitted to seek damages from whatever assets the Estate could establish as its own.

### 2. Lawsuits over the Estate's Assets

The Republic contends that the suits seeking recovery from the Estate of assets belonging to the Republic[11] are unrelated to the human rights litigation because one is about ownership of assets while the other is about torture. Hilao responds that one of the central issues in its human rights litigation is entitlement to the Estate's assets.

Hilao cites our opinion in *Siderman de Blake*, which involved a family's suit against the government of Argentina for torture and persecution. In that case, we remanded for a determination as to whether there was a direct link between the conduct alleged and Argentina's letter rogatory asking a California court for help in serving Jose Siderman. 965 F.2d at 722. We noted that serving Siderman "deliberately implicated our courts in that persecution," concluding, "If Argentina has engaged our courts in the very course of activity for which the Sidermans seek redress, it has waived its immunity as to that redress." *Id.*

█ Hilao has failed to demonstrate a "direct connection" between its action for human rights abuses and the Republic's pursuit of its assets. Clearly, the Republic has not engaged U.S. courts in helping the Marcoses or the Republic to commit such violations, and further, as the Republic notes, the Republic has not taken legal action *of any kind* against Hilao in the U.S. courts.

11. In addition to the suit in the Central District of California, *see also Republic of the Philippines v. Marcos*, 806 F.2d 344 (2d Cir.1986) (suit to recover and enjoin transfer of four buildings and suburban estate in New York), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *Sotheby's, Inc. v. Garcia*, 802 F.Supp. 1058 (S.D.N.Y.1992) (interpleader action in which Republic explicitly waived sovereign immunity to permit court to decide ownership of paintings); *Republic of the Philippines v. Marcos*, Civil No. 86–0155 (D.Haw. July 18, 1986) (suit by Central Bank to recover cash, gold and negotiable instruments impounded from Marcos by U.S. Customs).

### 3. Convention Against Torture

Hilao also makes an argument for waiver based upon the Republic's signing of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027 (1984), as modified, 24 I.L.M. 535 (1985), Article 14 of which states in part that "[e]ach State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Hilao contends that the Republic must have contemplated adjudication of torture claims in the U.S. when it ratified the treaty. Even if the Philippines does have a duty under the Convention to help in the redress of torture and other abuses committed by the Marcoses against citizens of the Republic, the Convention does not mandate that such redress occur in the United States courts. We conclude that the waiver exception does not apply.

### CONCLUSION

Because no exception to the FSIA applies to the Republic in this case, the district court lacked jurisdiction over the Republic. Thus, the district court would be without the power to enforce the injunction against the Republic in the capacity of an aider or abettor. The district court therefore abused its discretion by issuing a futile injunction. Because of our disposition of this issue, we need not reach the Republic's other claims.[12] The injunction is **VACATED** to the extent it purports directly to enjoin the Republic.

---

12. In any event, the injunction against the Republic was unnecessary in that the language of the injunction against the Estate prohibits the Estate from concluding an agreement with the Republic, or anyone else for that matter, purporting to transfer Estate assets.