19-2171-cv
*Barnet et al. v. Ministry of Culture & Sports of the Hellenic Republic*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2019
No. 19-2171-cv

HOWARD J. BARNET, AS TRUSTEE OF THE 2012 SARETTA BARNET
REVOCABLE TRUST, PETER L. BARNET, AS TRUSTEE OF THE 2012
SARETTA BARNET REVOCABLE TRUST, JANE L. BARNET, AS TRUSTEE
OF THE 2012 SARETTA BARNET REVOCABLE TRUST, SOTHEBY'S, INC.,
*Plaintiffs-Appellees*,

v.

MINISTRY OF CULTURE AND SPORTS OF THE HELLENIC REPUBLIC,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 5, 2020
DECIDED: JUNE 9, 2020

Before:     HALL, LYNCH, and MENASHI, *Circuit Judges*.

The Ministry of Culture and Sports of the Hellenic Republic
("Greece") appeals from a decision of the United States District Court
for the Southern District of New York (Failla, *J.*), issued on June 21,

2019, concluding that the court had subject-matter jurisdiction pursuant to the Foreign Sovereign Immunities Act over Plaintiffs' suit seeking declaratory relief against Greece.

We conclude that Greece's claim of ownership over an ancient horse figurine was not in connection with any commercial activity by Greece outside of the United States, and accordingly there is no jurisdiction pursuant to the FSIA. We **REVERSE** and **REMAND** with instructions to dismiss this action.

———————

GARY STEIN, Schulte Roth & Zabel LLP, New York, New York (Randall T. Adams, Bayard P. Brown, and Minji Reem *on the brief*), *for Plaintiffs-Appellees*.

ANDREW Z. SCHWARTZ, Foley Hoag LLP, Boston, Massachusetts (Leila A. Amineddoleh *on the brief*), *for Defendant-Appellant*.

———————

MENASHI, *Circuit Judge*:

In this appeal, we decide whether Greece's assertion of ownership over an ancient horse figurine was "in connection with a commercial activity" by Greece within the meaning of the Foreign Sovereign Immunities Act. We conclude that the assertion of ownership was in connection with Greece's enactment and enforcement of patrimony laws that declare the figurine to be the property of Greece and that these are sovereign rather than commercial activities. Accordingly, the FSIA does not authorize jurisdiction over this dispute, and we reverse and remand with instructions to dismiss for lack of jurisdiction.

In 2018, Sotheby's auction house announced that it planned to auction a bronze horse figurine on behalf of the 2012 Saretta Barnet Revocable Trust. Greek officials learned of the auction and sent a letter via e-mail to Sotheby's stating that the figurine belonged to Greece pursuant to its 1932 Antiquities Act and its 2002 Protection of Antiquities and Cultural Heritage in General Act (together, "patrimony laws"), which declared historic Greek artifacts to be the property of Greece. Sotheby's withdrew the figurine from its auction and subsequently joined the trustees of the Trust in filing suit against Greece in the Southern District of New York. Plaintiffs seek only declaratory relief on the disputed issue of ownership; they seek no damages or injunctive relief. As the basis for jurisdiction, Plaintiffs invoke the FSIA, which codifies certain enumerated exceptions to the rule that foreign states are immune from suit.

In denying Greece's motion to dismiss, the district court agreed with Plaintiffs that Greece lacks immunity here because its action of sending the letter claiming ownership falls within the FSIA's "commercial activity" exception. That exception authorizes suit against a foreign state that undertakes "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).[1] The district court reasoned that the "act" outside the United States was Greece's sending of the letter, and it was "in connection with a commercial activity" outside the United States because non-state actors may, and do, send demand letters claiming ownership of artifacts up for auction. In other words, the

---

[1] The commercial-activities exception covers two other circumstances that the parties agree do not apply here. *See* 28 U.S.C. § 1605(a)(2).

conduct was commercial because it was not the sort of activity in which only sovereigns engage.

We agree that the core challenged act in this case was Greece's sending of the letter asserting ownership over the figurine. We disagree, however, that the act was undertaken in connection with a commercial activity outside the United States. The connected activity was Greece's enactment and enforcement of patrimony laws that declare the figurine to be the property of Greece. The enactment and enforcement of such patrimony laws are archetypal sovereign activities and therefore do not provide the requisite connection to commercial activity that would authorize suit under the FSIA.

Because the commercial-activity exception was the only purported basis for jurisdiction, we reverse and remand with instructions to dismiss this action for lack of jurisdiction.

## BACKGROUND[2]

### I

In 1932, Greece enacted the Antiquities Act, which states that "[a]ll antiquities movable or immovable found in Greece and in any State land, in rivers, lakes and at the bottom of the sea, and in municipal, monasterial and private estates from ancient times onwards, are the property of the State." Diatagma (1932:5351) Περί αρχαιοτήτων [On Antiquities], ΕΦΗΜΕΡΙΣ ΤΗΣ ΚΥΒΕΡΝΉΣΕΩΣ (ΦΕΚ) [LEGAL GAZETTE] 1932, Art. 1 (Greece) [hereinafter Antiquities Act].

---

[2] The case was resolved at the threshold motion-to-dismiss stage. The district court did not purport to resolve any disputes of fact and relied only on the complaint and Greece's letter to Sotheby's, which was incorporated by reference into the complaint. *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, 391 F. Supp. 3d 291, 296 n.1 (S.D.N.Y. 2019).

The Act further provides that "[w]hoever becomes in any way the owner of an antiquity, must within fifteen days of the time it came in his/her possession, declare it to the nearest archaeological or police authority, or to the Archaeology Department of the Ministry of Education and Religious Affairs, while at the same time letting them know how he/she obtained this antiquity and, if possible, the place where this was found." *Id.*, Art. 5.

An owner who fails to make this required declaration within 15 days but who does so within two months will face a fine. *Id.*, Art. 6. If the declaration is made after two months, the fine will increase. *Id.* And "[i]f the holder of the antiquity is found after said two month period and prior to the declaration, in addition to the [increased] fine the confiscation of what was discovered will be done in favor of the State Museums." *Id.* "Whoever for the purpose of illegally disposing of an antiquity fails to declare possession thereof for more than two months, they shall be punished by imprisonment for 1 to 6 months and a fine of 1000-4000 drachmas." *Id.*

In 2002, Greece enacted the On the Protection of Antiquities and Cultural Heritage in General Act, which states that "the Greek State shall care for the protection of cultural objects originating from Greek territory whenever they may have been removed from it" and "wherever they are located." Nomos (2002:3028) Για την προστασία των Αρχαιοτή των και εν γέ νει της πολιτιστική ς κληρονομιάς [On the Protection of Antiquities and Cultural Heritage in General], ΕΦΗΜΕΡΊΣ ΤΗΣ ΚΥΒΕΡΝΉΣΕΩΣ (ΦΕΚ) [LEGAL GAZETTE] 2002, Art. 1(3) (Greece) [hereinafter Cultural Heritage Act]. The 2002 Act further provides that "[m]ovable ancient monuments dating up to 1453 belong to the State in terms of ownership and possession, are

imprescriptible and *extra commercium*." *Id.*, Art. 21(1).[3] The holder of such an object "may transfer his possession, after notifying the [Ministry of Culture] of his intention and the personal data of the candidate holder, who shall submit an application for a permit of possession," but "[a]ny transfer effected without this permit shall be null and void and the movable monuments shall be taken without formalities by the State." *Id.*, Art. 28(1).

The 2002 Act also authorizes criminal penalties: "Any person who transfers the ownership or the possession of a monument or acquires ownership or possession of a monument without the permit, authorization or notification, required by law, shall be punished by a term of imprisonment not exceeding two (2) years. An imprisonment of at least two (2) years shall be imposed in case of an ancient monument that has not been lawfully declared." *Id.*, Art. 59.

## II

The bronze horse figurine at the center of this case is "of Corinthian type, 14 cm tall, [and] from the Geometric Period." Compl. ¶ 1. It was sold at a public auction in Switzerland in 1967. Thereafter, the figurine was acquired by antiquities dealer Robin Symes, who then sold it to Howard and Saretta Barnet in 1973.[4] Howard Barnet passed away in 1992, and in 2012 the figurine was transferred to the

---

[3] The term "ancient monuments" is defined as "all cultural objects dating back to prehistoric, ancient, Byzantine and post-Byzantine times up to 1830." Cultural Heritage Act, Art. 2(b)(i).

[4] Decades later, Symes was suspected of selling stolen items. Greece confiscated "the Symes-Michailides photo archive" recording items that were in his possession. J. App'x 133.

2012 Saretta Barnet Revocable Trust. Saretta Barnet passed away in 2017, and the Trust consigned the figurine for auction at Sotheby's.

Sotheby's planned to auction the figurine on May 14, 2018, in New York City. On April 25, 2018, Sotheby's published an auction catalogue online that included the figurine as "Lot 4, Greek Figure of a Horse of Corinthian type, of stylized attenuated form standing on an openwork rectangular base, with crested mane with fine notches at the edge, cylindrical muzzle nearly encircled by grooved markings, long striated ears, and fragmentary tail, Bronze, Height 5 1/2 in (14 cm), Geometric Period, circa 8th Century BC, Greek," with an estimated auction price of $150,000 to $250,000. *Id.* ¶ 33.

On May 11, 2018, the Friday prior to the Monday auction date, the Greek Ministry of Culture emailed a letter to Sotheby's marked "URGENT." The letter made the following points:

- Greece "has become aware of your intention to auction, among other items, a bronze figurine of a horse, dated in the end of the Geometric era, in a session that will take place in New York in 14/05/2018." J. App'x 133.

- "[T]hree photos of this specific figurine are included in the Symes-Michailides photo archive," and the "specific figurine, which you intend to auction, is of Greek origin." *Id.*

- "There are no records in the archives of our Service (i.e. an export permit from Greece) to prove that this figurine has left the country in a legal way." *Id.*

- "The Greek National Law 5351/1932 on Antiquities and the one following it, Law 3028/2002, on the Protection of Antiquities and Cultural Heritage in General state that all movable ancient monuments belong to the State in terms of ownership and possession, are imprescriptible

7

and *extra commercium*. Additionally, according to the Greek Criminal Law (Act 3028/2002, article 55) the illegal acquisition and trading of cultural property of great value … constitutes a serious criminal offence, irrespective of where it takes place." J. App'x 133.

- Greece's "national legislation is fully in compliance with the relevant international Treaties including the UNSECO Convention on the Means of Prohibiting and Preventing the illicit Import, Export and Transfer of Ownership of Cultural Property, Paris 1970." *Id.*

- "In addition we would like to inform you that there is also in force a Memorandum of Understanding between the Government of the Hellenic Republic and the Government of the United States of America concerning the imposition of import restrictions on categories of Archaeological and Byzantine Ecclesiastical, Ethnological material through the 15th century A.D. of the Hellenic Republic." *Id.*

- "For all above reasons and reserving all our rights, WE ASK YOU TO: - immediately withdraw the ancient Greek figurine of the list from the items to be auctioned on 14/05/2018[;] refrain, from today on, from any activity related to any type of delivery of the figurine to any third party[; and] contact us immediately in order to confirm your intention to conform to the above and subsequently cooperate for the repatriation of the coin [sic] and its return to the Greek state." *Id.* at 133-34.

- "In any case, Greece reserves the right to take the necessary legal action in the competent courts in order to repatriate the coin [sic]." *Id.* at 134.

After receiving the letter, Sotheby's withdrew the figurine from its auction and responded to Greece in writing, disputing Greece's

claim to ownership but inviting Greece to provide any evidence in support of its claim. Greece did not respond.

On June 5, 2018, Sotheby's and the trustees of the Trust sued Greece in the Southern District of New York. Plaintiffs seek no damages or injunctive relief. The sole count for relief is for a "Declaration of Ownership."

Greece filed a motion to dismiss for lack of jurisdiction, arguing that Greece was immune from suit by reason of sovereign immunity and that Plaintiffs had not satisfied any FSIA exception. On June 21, 2019, the district court denied that motion, concluding that Greece's act of sending the letter was commercial, that it had a direct effect in the United States, and therefore that the commercial-activity exception of the FSIA applied. *Barnet*, 391 F. Supp. 3d 291. In the district court's view, the core act challenged in the suit was Greece's sending of the letter to Sotheby's in May 2018; because private parties send letters claiming ownership of historical artifacts up for auction, the act was not uniquely sovereign and therefore was commercial. *Id.* at 299-300.

Greece filed an interlocutory appeal of that order, and the district court has stayed proceedings pending appeal.[5]

---

[5] "Our jurisdiction over the district court's FSIA ruling is premised on the collateral order doctrine, which 'allows an immediate appeal from an order denying immunity under the FSIA.'" *Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 203 (2d Cir. 2018) (quoting *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007)). Because the decision under review was made on a motion to dismiss and did not purport to decide any dispute of fact, the determination of whether Plaintiffs carried their burden under the commercial-activity exception is a

## DISCUSSION

### I

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country. The Act states that a 'foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607.'" *Petersen*, 895 F.3d at 204 (internal quotation marks and citation omitted). Sovereign immunity from suit is the default rule, subject only to specific exceptions.

The parties agree that the only exception at issue in this case is the "commercial-activity exception," which contains three separate clauses:

> A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case ... in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

Plaintiffs focus on clause 3, also known as the "direct-effect clause," and accordingly our analysis is limited to that provision. To satisfy the clause, the suit must be "(1) based upon an act outside the

legal matter reviewed *de novo*. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1016-17 (2d Cir. 1991).

10

territory of the United States; (2) that was taken in connection with a commercial activity of [Greece] outside this country; and (3) that caused a direct effect in the United States." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (internal quotation marks and alterations omitted).

For the first element, "we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims." *Petersen*, 895 F.3d at 204. We look at the "core" of Plaintiffs' suit: the particular acts for which relief is sought. *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015).

For the second element, we identify the "activity" in connection with which the core act was taken, then ask whether that activity was an exercise of "'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Weltover*, 504 U.S. at 614). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

The third element is satisfied if an effect "simply follow[ed] as an immediate consequence of the defendant's activity." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) (internal quotation marks and alterations omitted). The effect "need not be 'substantial' or 'foreseeable.'" *Id.*

## II

We first must identify Greece's predicate "act" that "serves as the basis for plaintiffs' claims." *Petersen*, 895 F.3d at 204. We look for

11

the "core" action taken by Greece outside the United States for which relief is sought, *OBB*, 136 S. Ct. at 396, as defined by the "elements of [the] claim that, if proven, would entitle [Plaintiffs] to relief under [their] theory of the case," *Nelson*, 507 U.S. at 357.

The district court correctly concluded that "sending the Demand Letter" from Greece to Sotheby's in May 2018 was the predicate act. *Barnet*, 391 F. Supp. 3d at 298, 299. The letter "assert[ed] an ownership interest in the Bronze Horse when demanding that Sotheby's withdraw the figure from the auction." *Id.* at 299. The complaint confirms that sending the letter claiming ownership was the "core" act that Plaintiffs challenge. *OBB*, 136 S. Ct. at 396.

Having identified the core predicate act—sending a letter asserting ownership of the figurine—we next determine whether that act was taken "in connection with a commercial activity" by Greece outside the United States. 28 U.S.C. § 1605(a)(2). It was not.

The district court analyzed whether sending a letter claiming ownership was an act that a private party may typically undertake in the marketplace and, concluding that it was, the court found that act to be commercial and therefore not sovereign.[6] The error in this analysis was treating Greece's act of sending the letter as *both* the predicate "act" *and* the related "commercial activity" required by § 1605(a)(2). The direct-effect clause applies when a suit seeks relief for an "act" that a foreign state undertakes "in connection with a commercial activity," 28 U.S.C. § 1605(a)(2), and a single act cannot be

---

[6] *See Barnet*, 391 F. Supp. 3d at 299 ("Plaintiffs argue that the relevant conduct, the act of sending the Demand Letter, was a commercial activity, while Defendants assert that the act was purely sovereign in nature. The Court agrees with Plaintiffs.") (internal citations omitted).

undertaken in connection with itself. If the letter were properly considered to be both the act and the commercial activity—that is, if Plaintiffs were seeking relief for a single, self-contained commercial activity—it would suggest that Plaintiffs should proceed under the first clause of the commercial activity exception, which authorizes suits "based upon a commercial activity carried on in the United States by the foreign state," rather than the direct-effect clause, which requires both an act and a commercial activity to which the act is connected. *Id.*; *see also Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 166 (D.C. Cir. 1994).

But we think the parties have properly focused on the direct-effect clause because the letter was not a single, self-contained activity. In their suit, Plaintiffs do not challenge the mere sending of the letter but the claim of ownership over the figurine that the letter expresses. It is apparent that Greece undertook the act of sending the letter in connection with its claim of ownership over the figurine pursuant to its patrimony laws. [7] Identifying the activity in connection with which the letter was sent, as the statute requires, reveals its sovereign nature: Greece has claimed ownership over the figurine by adopting legislation that nationalizes historical artifacts and by enforcing those patrimony laws.

In its letter to Sotheby's, Greece expressly invoked the "Greek National Law 5351/1932 on Antiquities and the one following it, Law

---

[7] At oral argument, counsel for Plaintiffs acknowledged that the letter was sent in connection with Greece's claim of ownership. Oral Argument Audio Recording at 22:08-22:21 ("[T]he act … is the sending of the letter under the statute. The commercial activity elsewhere is Greece's assertion of its ownership—purported ownership—of this property, which also happened elsewhere.").

3028/2002, on the Protection of Antiquities and Cultural Heritage in General," which "state that all movable ancient monuments belong to the State in terms of ownership and possession, are imprescriptible and *extra commercium*." J. App'x 133. Those laws declare artifacts such as the figurine to be the property of Greece. *See* Cultural Heritage Act, Art. 21(1) (declaring that "[m]ovable ancient monuments … belong to the State in terms of ownership and possession"); Antiquities Act, Art. 1 (declaring that "[a]ll antiquities movable or immovable found in Greece … are the property of the State"). Those laws also regulate the export of artifacts such as the figurine and impose criminal liability in certain circumstances, as Greece noted in its letter.

Nationalizing property is a distinctly sovereign act. *See Nelson*, 507 U.S. at 362 ("[L]egislation … can be performed only by the state acting as such."); *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006) ("Expropriation is a decidedly sovereign—rather than commercial—activity."); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 254 (7th Cir. 1983) (recognizing that "the nationalization of [property] … is a quintessential Government act"); *see also Petersen*, 895 F.3d at 201 ("[A] sovereign's power of expropriation … can be vast."). Just as nationalization or expropriation of property is considered a sovereign activity rather than a commercial "claim of ownership" by the foreign state, so too here Greece is acting in a sovereign capacity by enforcing laws that regulate ownership and export of nationalized artifacts. A "foreign state's exercise of the power of its police has long been understood … as peculiarly sovereign in nature," *Nelson*, 507 U.S. at 361, as has "the sovereign's right to regulate its exports" through a permitting process, *Honduras*

14

*Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 549 (11th Cir. 1997).[8]

The FSIA directs that the commercial or sovereign character of an activity be determined by reference to the "nature" of the activity rather than its "purpose." 28 U.S.C. § 1603(d). Here, the "outward form" of Greece's "activity" was the enactment and enforcement of laws declaring the figurine to be state property. *Weltover*, 504 U.S. at 617. Its insistence on recognition of and obedience to its patrimony laws are not "the *type* of actions by which a private party engages in 'trade and traffic or commerce,'" nor is that activity "analogous to a private commercial transaction." *Id.* at 614, 616. Plaintiffs contend that because Greece has not physically seized the figurine it has not undertaken the sovereign acts of nationalization or law enforcement.[9] But we think that adopting its patrimony laws and insisting on compliance with those laws is enough to establish that its activity was sovereign rather than commercial. The FSIA does not require a foreign state to invade the United States and to seize disputed property in order to maintain its immunity from suit. Even though a private party might be able to send a letter disputing ownership of an object, no private party could nationalize historical artifacts and regulate the export and ownership of those nationalized artifacts— and that is the activity in connection with which Greece sent its letter.

---

[8] At oral argument, counsel for Plaintiffs acknowledged that "only a foreign state can make an ownership claim to allegedly stolen property pursuant to a patrimony law." Oral Argument Audio Recording at 25:20 to 25:26.

[9] *See* Oral Argument Audio Recording at 29:33 to 29:37 ("That might be a sovereign act if they actually go out and grab it. But that's not what they did here.").

15

In *Anglo-Iberia Underwriting Management v. P.T. Jamsostek*, 600 F.3d 171 (2d Cir. 2010), we explained that even though a state-owned health insurer provided services that resembled those of a private insurer, it was important to recognize that it did so "as the default health insurer under Indonesia's national social security program." *Id.* at 177. Because it acted within that legal framework, its activities did "not equate to those of an independent actor in the private marketplace of potential health insurers" but were "sovereign in nature" and outside "the 'commercial activity' exception to the FSIA." *Id.* at 178. Here, too, we think that Greece is not buying or selling historical artifacts "in any traditional sense" and "does not otherwise compete in the marketplace like a private" antiquities dealer. *Id.* at 177. Rather, it is seeking to enforce a scheme of patrimony laws according to which artifacts such as the figurine are "*extra commercium*." To "hold otherwise and look only to the fact of [a mere claim of ownership] for purposes of our 'commercial activity' analysis would allow the exception to swallow the rule of presumptive sovereign immunity codified in the FSIA." *Id.* at 178.

Our conclusion finds additional support in the Ninth Circuit's decision in *Hilao v. Estate of Marcos*, 94 F.3d 539 (9th Cir. 1996). In that case, the Philippines had frozen, seized, or sold various assets around the world to repatriate money that had allegedly been stolen by the Philippines' former president. The Ninth Circuit held that the Philippines was "acting under a statutory mandate to recover property allegedly stolen from the treasury," which was an "exercise of police power [that] is a governmental rather than commercial activity." *Id.* at 546. Likewise here, we think it misses the nature of Greece's activity to ignore the scheme of patrimony laws that governs it. That would be like saying that the Philippines was merely claiming

16

ownership and selling property, as any private party might do. Although the district court was correct that merely claiming ownership or encouraging cultural heritage are not uniquely sovereign activities, *Barnet*, 391 F. Supp. 3d at 300, the district court did not appreciate that Greece's act of sending its letter was connected to the sovereign activity of claiming ownership through nationalization and enforcement of patrimony laws.

Plaintiffs contend in response that the patrimony laws may not even apply to this particular figurine because it is unclear whether it left Greece before the patrimony laws went into effect or because the laws may be unenforceable here because of due process concerns about applying Greek law to property in the United States.[10] But these arguments confirm that the issue in this case—ownership of the figurine—is inextricably bound up with sovereign activity. Litigation of Plaintiffs' claims would require the district court to evaluate the validity, scope, and application of Greece's patrimony laws—putting at issue precisely those sorts of sovereign acts for which Greece enjoys sovereign immunity. "[P]ermitting the cause of action here would appear to undermine the immunity Congress intended to confer on [Greece] under the FSIA." *Garb*, 440 F.3d at 589-90.[11]

---

[10] *See, e.g.*, Oral Argument Audio Recording at 30:00 to 30:06 ("The whole thesis of our complaint is that [the figurine] doesn't fall within the law because there's no proof that it was stolen."); *id.* at 32:59-33:13 ("There are potential defenses as a matter of due process. If the Patrimony Law hasn't actually been communicated or actually enforced, there is a vein of caselaw to that effect, under U.S. caselaw, that I think might be applicable.").

[11] In briefing to this Court, Plaintiffs suggest that if the figurine were recovered, perhaps Greece would use it in connection with commercial exhibits in Greece, and that might provide a connection between the letter and a commercial activity. The complaint contains no allegation of such a

## CONCLUSION

Greece's act of sending the letter was not in connection with a commercial activity outside of the United States. Because the direct-effect clause of the commercial-activity exception in 28 U.S.C. § 1605(a)(2) is not satisfied, the district court erred in concluding that it had jurisdiction. We therefore do not address Greece's remaining arguments on appeal, and we **REVERSE** the district court's decision and **REMAND** with instructions to dismiss this action for lack of subject-matter jurisdiction.

---

future use, but even if it did, the outcome would not change. Sovereigns do not lose immunity because parties can imagine potential commercial activities downstream from the sovereign activity. *See Garb*, 440 F.3d at 587 ("Concededly, the expropriation of property … is, in some sense, 'connected' to any subsequent commercial treatment of that property or its proceeds. … Such a connection, however, is simply too 'attenuated,' and not substantive enough, to satisfy § 1605(a)(2)."); *see also Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 57 (2d Cir. 2016) ("[A] plaintiff must cite more than tangential commercial activities to which the 'acts' forming the basis of the claim have only an attenuated connection.") (internal quotation marks omitted).